IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| CLIFTON WHITE, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:14cv00018 |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | By:     Joel C. Hoppe |
| Social Security Administration, | ) | United States Magistrate Judge |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Clifton White asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–422, 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that the Commissioner's final decision is not supported by substantial evidence. The decision should be reversed and the case remanded.

### I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

1

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a) (governing claims for DIB), 416.905(a) (governing adult claims for SSI). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5)

whether he or she can perform other work. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

White filed for DIB and SSI on February 1, 2011. *See* Administrative Record ("R.") 219. He was 58 years old, *id.*, and had worked for over 30 years as a professional singer, R. 224. White alleged disability beginning on April 5, 2009, because of post-traumatic stress disorder, depression, anxiety, and "abnormal grief." R. 223. The state agency twice denied his applications. R. 101, 124–25. White appeared with counsel at a hearing before an ALJ on November 2, 2012. R. 41. At the hearing, counsel amended White's alleged disability onset date to September 1, 2010, the date White entered counseling. R. 45.

The ALJ denied White's applications in a written decision dated December 31, 2012. R. 19–34. He found that White suffered from a severe anxiety disorder, affective disorder, personality disorder, and benzodiazepine dependence, R. 22, but that these impairments did not meet or equal a listing, R. 22–24. The ALJ next determined that White had the residual functional capacity ("RFC")[1] to perform "simple, routine, repetitive work that does not deal with the public and involves only occasional interactions with co-workers." R. 24.

The ALJ noted that this RFC ruled out White's return to his past relevant work as a professional singer. R. 32. Finally, relying on a vocational expert's hearing testimony, the ALJ concluded that White was not disabled because he could perform other jobs available nationally

---

[1] "RFC" is a claimant's maximum ability to work "on a regular and continuing basis" despite his impairments. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the claimant's record and must reflect the "total limiting effects" of the claimant's impairments. 20 C.F.R. §§ 404.1545, 416.945.

or in Virginia, such as cleaner, non-federal mail clerk, and laundry sorter. R. 33. The Appeals Council declined to review that decision, R. 1, and this appeal followed.

### III. Facts

White's medical records document a history of anxiety, depression, and insomnia. His primary-care provider prescribed various combinations of Ativan (lorazepam), Prozac (fluoxetine), Lexapro (escitalopram), Effexor (venlafaxine), Buspar (buspirone), and Ambien (zolpidem) to treat those conditions between July 2009 and August 2010. *See* R. 281, 288–97, 300–10. White alleges that his anxiety and depression became disabling on September 1, 2010, the date he established care at Crossroads Christian Counseling Center. R. 45. White attended counseling sessions at Crossroads once a week between September 1, 2010, and August 8, 2011.[2] *See* R. 333, 338–39, 405, 410. On February 14, 2011, Crossroads counselor Aline Weaver Kent filled out a check-box form indicating that White would be "unable to participate in employment and training activities in any capacity" for at least 60 days. R. 340.

White visited Health Center of the Piedmont to refill his medications on February 18, 2011. R. 312. He told Nurse Judy Broughton that he wanted a new primary-care provider because his current practitioner wanted proof of counseling before she would refill his Ativan. *Id.* Nurse Broughton told White that she followed the same rule and that he would have to find a psychiatrist to manage his medications. R. 313.

White checked himself in to a residential crisis center on March 2, 2011, because he was "experiencing depression symptoms and [a] discrepancy in his medications." R. 325. He denied suicidal ideation, and a mental status exam was normal. R. 325. The intake clinician diagnosed depressive and anxiety disorders and assigned a Global Assessment of Functioning ("GAF")

---

[2] There are no contemporaneous treatment notes from those sessions in the record.

4

score of 40.[3] R. 325–26. White saw Dr. Renuka Prasad on the same day. R. 371–72. He reported

often feeling lonely, depressed, anxious, and preoccupied. R. 372. White said that he

contemplated suicide in "recent months," but explained that he would not kill himself "because

of his religion." *Id.* Dr. Prasad decreased White's medications and instructed him to undergo

"cognitive, interpersonal, and supportive therapy." *Id.* White actively participated in several

counseling sessions during his stay at the center. *See* R. 323, 324, 327. He left on March 11,

2011, "after meeting all of his treatment goals." R. 603.

White also filled out an Adult Function Report on March 11, 2011. R. 242–49. On a

typical day, White planned his medication schedule, did household chores, ran errands, went to

doctors' appointments, tended to his pet cat, and read or watched television. R. 242–44. White's

psychological symptoms did not interfere with his ability to care for himself, prepare simple

meals, take his medications on a set schedule, handle his personal finances, or drive a car. R.

243–45. White explained that he was estranged from his family, but he did not report any trouble

getting along with non-family members or authority figures. R. 247–48. He had some trouble

---

[3] GAF scores represent a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (*DSM-IV*). The GAF scale is divided into 10 ten-point ranges reflecting different levels of symptoms or functioning, with 1–10 being the most symptomatic or least functional, and 91–100 being the least symptomatic or most functional. *See id.* The ranges do not distinguish between symptoms and functional impairments. *See id.* Thus, when "the individual's symptom severity and level of functioning are discordant, the final GAF [score] always reflects the worse of the two." *Id.* at 32–33. A GAF score of 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as . . . family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . .)." *DSM-IV* 34.

The American Psychiatric Association now cautions that GAF scores do not adequately convey the information needed to assess an individual's mental state, functional capacities, or treatment needs over time, and it recommends that clinicians cease using them for assessment. *See* Am. Psychiatric Ass'n, *Frequently Asked Questions About DSM-5 Implementation–For Clinicians*, Aug. 1, 2013, http://www.dsm5.org/Documents/FAQ%20for%20Clinicians%208-1-13.pdf.

remembering spoken instructions, but no trouble understanding or executing written instructions. R. 247. He estimated that he could pay attention for 15 or 30 minutes at a time. *Id.* Finally, White explained that he did not participate in social activities because he lived in a rural area and had lost interest in people. *See* R. 246, 247, 248.

On March 30, 2011, state-agency psychologist Dr. David Niemeier, Ph.D., reviewed White's medical records available through March 22, 2011. *See* R. 82, 85–89. He opined that White's severe affective disorder, anxiety disorder, and personality disorder "moderately" interfered with his ability to complete activities of daily living, interact appropriately with others, and maintain concentration, persistence, and pace. *See* R. 85, 86–87. He also identified several specific work-related abilities in which White was "moderately limited," such as maintaining attention and concentration for extended periods, performing activities within a schedule and at a consistent pace without unreasonable breaks, and sustaining an ordinary routine without special supervision. R. 87. Dr. Niemeier explained that White was not disabled because he still could complete "simple, repetitive tasks," R. 88, "understand and follow simple directions[,] and perform simple routine work activity," R. 89.

White established care with Dr. William Trost, M.D., on March 24, 2011. R. 357. He told Dr. Trost that his mood had improved since leaving the crisis center and that he wanted to continue Ativan, Prozac, Buspar, and Ambien "essentially as is." *Id.* Dr. Trost observed that White exhibited "moderate anxiety," mostly likely "associated with today's appointment." *Id.* He decreased White's Prozac and instructed him to follow up with the clinic's nurse in two months. R. 357–58. White saw Nurse Karen Jones on May 19, 2011. R. 359. He reported that his "medications ha[d] been quite helpful" and that he was "doing well" at the time. *Id.* Nurse Jones instructed White to continue his medications and return in one month. *See id.* White reported

6

"doing OK" at his next visit on June 16, 2011. R. 598. A mental status exam was normal, and Nurse Jones observed that White was noticeably less anxious and depressed. *See id.*

White saw Dr. Paoloa Habib, M.D., at the University of Virginia on July 15, 2011. R. 443–47. He reported anxiety and depression beginning in 2009 when his mother and brother passed away, he was laid off, and he moved to rural Pittsylvania County to live with a "very difficult" friend. R. 444. White said that he often contemplated suicide by hanging or drowning, but that he had never tried to hurt himself. *See id.* Dr. Habib diagnosed generalized anxiety disorder and "recurrent, severe" major depressive disorder. R. 446. She also noted that White did not pose a danger to himself or require treatment beyond medication management at this time.[4] *Id.* Dr. Habib recommended that White switch from Prozac to Paxil. R. 447.

Regina Curtis, D. Min., a clinical pastoral counselor at Crossroads, R. 409, filled out a short Medical Source Statement on July 18, 2011. R. 380–81. She opined that White had no difficulty getting along with other people or executing short, simple instructions; "moderate" difficulty making simple decisions, performing at a consistent pace, and responding to changes in a routine; "marked" difficulty maintaining concentration or focus; and "extreme" difficulty dealing with normal work stress. R. 381. Ms. Curtis also estimated that White would need to take at least four unscheduled 15-minute breaks during a normal 40-hour workweek. *Id.*

Ms. Curtis completed a more detailed Mental Status Evaluation Form on August 8, 2011. R. 405–13. Attached to that form was a four-page typed narrative summarizing White's treatment history at Crossroads and explaining some of the functional limitations that Ms. Curtis identified on the Medical Source Statement. *See* R. 405, 410–13. The narrative also documented

---

[4] Dr. Habib also assigned a GAF score of 41–50, *see* R. 446, which indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)," *DSM-IV* 34.

7

Ms. Curtis's impressions of White's memory, mood, thought content, judgment, and concentration between September 2010 and August 2011. *See* R. 411–13. Ms. Curtis explained that White's mental status exams were generally normal "unless he is in one of his depressed states" or "very anxious." R. 412, 413.

White visited Nurse Broughton's clinic three times in July 2011. *See* R. 383–84, 386–87, 389–90. On July 25, Nurse Broughton noted that White was anxious and confused about Dr. Habib's recommendation that he switch to Paxil. R. 383–84. Nurse Broughton told White to continue his medications until they consulted Dr. Trost or Nurse Jones. R. 384. White returned to Dr. Trost's office on August 11 reporting "some ongoing anxiety and depression." R. 597. He admitted "some passive" suicidal ideation in July, but denied such thoughts on this visit. *Id.* A mental status exam was normal, and Dr. Trost noted that White was in a reasonably good mood. *See id.* Dr. Trost increased White's Prozac and Ativan in an effort to relieve his "ongoing symptoms." *Id.*

On August 25, 2011, state-agency psychologist Dr. Donald Bruce, Ph.D., reviewed White's updated medical records available through August 16, 2011. R. 103–04, 107–09. Dr. Bruce agreed with Dr. Niemeier's earlier assessment of White's mental abilities and limitations. R. 107–09. He also explained that White's moderate limitations maintaining concentration, persistence, and pace, *id.*, did not prevent him from performing a wide range of unskilled work,[5] *see* R. 111.

---

[5] Unskilled work "is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher v. Barnhart*, 181 F. App'x 359, 364 n.3 (4th Cir. 2006) (quoting 20 C.F.R. § 404.1568(a)). It requires the ability to understand, remember, and execute simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985).

White was "improved but still symptomatic" when he returned to Dr. Trost's clinic on October 6, 2011. R. 595. Dr. Trost noted that White appeared "mildly depressed/anxious" at this visit. *Id.* He decreased White's Prozac and added Wellbutrin XL. *See id.* White reported a "bad reaction" to the Wellbutrin during his next visit on December 1, 2011. R. 593. A mental status exam was unremarkable except for White's anxious mood and affect. *Id.* Dr. Trost discontinued Wellbutrin and, after noting that White still experienced "significant symptoms" on Prozac, substituted Zoloft.

White returned to Dr. Trost's clinic on January 13, 2012, complaining of "significant" suicidal ideation over the holidays. R. 590. He admitted "overusing" Ativan to relieve anxiety during that time. *See id.* White expressly denied suicidal ideation on this visit and explained that "these symptoms ha[d] abated since the holidays ended." *Id.* A mental status exam was normal except for White's mildly depressed mood. *Id.* Dr. Trost noted that White's anxiety was not responding to Buspar and Zoloft. *See id.* He prescribed a "fairly aggressive[]" amount of Xanax "on the firm condition" that White take it only as directed. *Id.*

Three days later, White went to the emergency room after hitting his head. R. 450. The attending physician prescribed a narcotic pain medication and discharged White in stable condition a few hours later. *See* R. 455. White's friend delivered him to the ER with an "altered mental state" on January 18, 2012. *See* R. 485–88. The attending physician noted that White was clearly confused, drowsy, and apparently intoxicated. R. 486, 488. White tested positive for benzodiazepines and opiates. R. 491. The physician opined that White had overdosed and needed to be hospitalized—involuntarily, if necessary. R. 494.

White was voluntarily admitted to Virginia Baptist Hospital that evening, R. 566, 570–71, and returned to a stable baseline within a few days. R. 475, 481. He was discharged in

"normal" condition on January 23, 2012. R. 562, 473. The discharging physician noted that White's "altered mental status and psychosis [were] likely due to medication overuse" after Dr. Trost changed his prescriptions. R. 475. She instructed White to continue his current medications and to follow up with Dr. Trost and Nurse Broughton. R. 476.

White saw Dr. Trost on February 16 and March 30, 2012. R. 587, 588. On February 16, Dr. Trost observed that White's affect was "constricted but appropriate" and his mood was "slightly anxious." R. 588. White agreed that he "need[ed] to come off the benzodiazepines" after his recent overdose. *Id.* Dr. Trost instructed White to decrease Buspar and substitute Ativan for Xanax. *See id.* On March 30, White reported increased anxiety on the lower dose of Buspar. R. 587. He also admitted "fleeting suicidal ideation[,]" but denied having a plan to hurt himself. *Id.* A mental status exam was normal except for White's "anxious" mood. *See id.* Dr. Trost noted that he "would like to see [White's] anxiety somewhat better controlled." *Id.* He acknowledged that White was "pushing himself harder" to engage in social activities despite his anxiety. *Id.* Dr. Trost instructed White to add Depakote for his headaches and to continue Ativan, Buspar, and Zoloft as prescribed. *See id.*

On April 12, 2012, Dr. Trost wrote a letter in which he opined that White was "fully and permanently disabled [by] severe, recurrent major depressive disorder [and] . . . general anxiety disorder." R. 579. He noted that White's "symptoms [had] not responded to aggressive treatment" over the past year and that White had been hospitalized "for a suicidal gesture" during the same time. *Id.* Dr. Trost did not expect White's symptoms, including severe anxiety and "ongoing suicidal ideation," to subside any time soon. *Id.* He also opined that White's "symptoms would predictably worsen" if he tried to return to work at this time. *Id.*

10

White returned to Dr. Trost's clinic on May 25 and July 20, 2012. R. 581, 583. On May 25, White reported doing "fairly well" and benefiting from group therapy. R. 583. He resisted Dr. Trost's suggestion that he decrease Ativan, and Dr. Trost did not press the issue. *See id.* A mental status exam was normal, and Dr. Trost noted that White was in a reasonably good mood. *See id.* On July 20, White reported "significant ongoing anxiety," which he attributed to a recent family visit, panic attack, and drunk-driving incident. R. 581. He reported "ongoing" depression, but expressly denied suicidal ideation. *Id.* On exam, Dr. Trost noted that White appeared tense, anxious, and depressed.[6] *See id.* He added Risperdal to White's Ativan, Buspar, Depakote, and Zoloft. *See* R. 581–82.

On November 2, 2012, White testified that he performed court-ordered community service at a thrift store for three hours a day, two days a week. R. 48. On other days, his depression was so bad that he did not leave his room. *See* R. 49. White testified that he avoided people and felt isolated, mostly because he lived in a rural area. *See* R. 49–51. He also explained that he did not "really have any tools to deal with people," R. 51, and was not "sure if [he] ever learned" how to cope with stress, R. 54. He reported having panic attacks both at home and in public. R. 55.

### IV. Discussion

White's overarching objection is that the ALJ misapplied the law when weighing Dr. Trost's, Ms. Curtis's, and Ms. Kent's opinions. *See generally* Pl. Br. 10–14, ECF No. 16. He argues that this purported legal error undermines the ALJ's listings analysis at step three, *id.* at 15–16, as well as his finding at step four that White can still perform at least simple, routine, repetitive work on a full-time basis, *see id.* at 9, 11–14.

---

[6] Dr. Trost also assigned a GAF score of 45 on both visits. R. 582, 584.

*A.    Medical-Source Opinions*

ALJs must weigh each "medical opinion" in the claimant's record. 20 C.F.R. §§ 404.1527(c), 416.927(c). Medical opinions are statements from "acceptable medical sources," such as psychiatrists, that reflect judgments about the nature and severity of the claimant's impairment, including his symptoms, diagnosis and prognosis, and functional abilities and limitations.[7] 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical consultants. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

A treating-source medical opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ finds that a treating-source medical opinion is not entitled to controlling weight, he then must weigh the opinion in light of factors including the source's specialty, the source's familiarity with the claimant, the weight of the evidence supporting the opinion, and the opinion's consistency with other evidence in the record. *Burch v. Apfel*, 9 F. App'x 255, 259 (4th Cir. 2001) (per curiam); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ must consider the same factors when weighing medical opinions from non-treating sources. 20 C.F.R. §§ 404.1527(c), 404.1527(e)(2), 416.927(c), 416.927(e)(2).

---

[7] They are distinct from medical-source opinions on issues reserved to the Commissioner, such as the claimant's RFC or whether he is "unable to work." 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). The ALJ must consider these opinions as he would any relevant evidence, but he need not accord "any special significance" to the source's medical qualifications. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Morgan v. Barnhart*, 142 F. App'x 716, 722 (4th Cir. 2005).

12

The ALJ must explain the weight given to all medical opinions, *Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013), and he must give "good reasons" for the weight assigned to any treating-source medical opinion, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro*, 270 F.3d at 178 (the ALJ may reject a treating-source medical opinion "in the face of persuasive contrary evidence[,]" but only if he gives "specific and legitimate reasons" for doing so). If the ALJ's RFC assessment conflicts with a medical opinion, he also must explain why that opinion was not adopted in full. *Harder v. Comm'r of Soc. Sec.*, No. 6:12cv69, 2014 WL 534020, at *4 (W.D. Va. Feb. 10, 2014) (citing SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996)). His "decision 'must be sufficiently specific to make clear to any subsequent reviewers the weight [he] gave' to the opinion and 'the reasons for that weight.'" *Id.* (quoting SSR 96-8p, at *5)).

Non-acceptable medical sources, such as counselors, cannot give "medical opinions" about the claimant's condition. *See Ward v. Chater*, 924 F. Supp. 53, 56 (W.D. Va. 1996); 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). But they can provide valuable information about the claimant's medical condition and functional limitations, and the ALJ must consider that information as he would any relevant evidence. *Adkins v. Colvin*, No. 4:13cv24, 2014 WL 3734331, at *3 (W.D. Va. July 28, 2014) (Kiser, J.). The ALJ may consider opinions from non-acceptable medical sources as he would opinions from acceptable medical sources, and he should do so when the source "had a lengthy relationship with the claimant." *Id.* at *3 n.6. But non-acceptable medical sources are not "treating" sources, and their opinions are not entitled to special deference under the regulations. *See id.* at *3; 20 C.F.R. §§ 404.1527, 416.927.

B.     *The ALJ's Findings*

The ALJ considered the available medical-source opinions at steps three and four. *See* R. 22–23, 30–32. At step three, he adopted Drs. Niemeier and Bruce's opinions that White's severe

13

mental impairments caused "moderate" limitations in his ability to complete activities of daily living, interact appropriately with others, and maintain concentration, persistence, or pace. R. 23. He also "generally adopted" Drs. Niemeier and Bruce's RFC assessments at step four "because they [were] consistent with the other credible evidence" in White's record. R. 32. The ALJ's RFC finding expressly incorporates Dr. Niemeier's opinion that White could perform simple, routine, repetitive tasks, and it is consistent with both psychologists' opinions that White "may experience some social interaction problems." *See* R. 24, 87, 109.

The ALJ rejected Dr. Trost's, Ms. Curtis's, and Ms. Kent's opinions in full. R. 31. He found that the providers' "conclusory opinions that [White] is unable to work" addressed an issue reserved to the Commissioner and were "not supported by the longitudinal record, with its limited physical findings and generally routine and conservative treatment, including their own treatment notes." *Id.* He also found that each provider's assessment seemed "more based on [White's] reported symptoms and limitations, rather than on objective findings and diagnostic test results." *Id.*

The ALJ rejected Dr. Trost's opinions of White's symptoms and functional limitations because they conflicted with White's medical records and recent "work-like" community service. R. 21, 31. The ALJ rejected Ms. Curtis's opinions of White's functional limitations because she is a non-acceptable medical source, she "did not provide any contemporaneous counseling notes [or] mental status examinations," and her opinions were inconsistent with other providers' "normal" findings on mental status exams. R. 31. He also reasoned that White would be in "ongoing treatment with a psychiatrist or psychologist, rather than just counseling," if he were as limited as Ms. Curtis suggested in July 2011. *Id.* Finally, the ALJ gave "little weight" to the providers' "subjective GAF scores" because they were not supported by White's consistently

"unremarkable" mental status exams or "treatment consisting of routine bimonthly medication checks and group therapy." R. 30.

C.    *Analysis*

White argues that the ALJ misapplied the law when evaluating Dr. Trost's, Ms. Curtis's, and Ms. Kent's opinions. *See* Pl. Br. 11–13. He asserts that all three are "treating" sources whose opinions deserved "special deference," *id.* at 11, and that the ALJ did not give "good reasons" for rejecting their opinions, *id.* at 12. *See also id.* at 13 & n.18. White also asserts that the ALJ did not weigh the providers' opinions in light of the factors listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c). *See id.* at 12. These particular arguments are meritless.

Ms. Curtis and Ms. Kent are pastoral counselors; they are not "treating" sources, and their opinions are not entitled to deference under the regulations. *See Adkins*, 2014 WL 3734331, at *3. Dr. Trost is the only treating source whose medical opinions might deserve "special weight in certain circumstances." *Morgan*, 142 F. App'x at 722. The ALJ found that Dr. Trost's opinions were "not consistent with the record or supported by the medical evidence, which are appropriate reasons" to give them less than controlling weight. *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014).

The ALJ also explicitly considered the required factors when weighing each provider's opinion about White's symptoms and functional limitations. *See* R. 28–31. He acknowledged that Dr. Trost is a psychiatrist who saw White for bimonthly medication checks in the year before giving his opinion. R. 26, 27, 28, 29, 31; *see* 20 C.F.R. § 404.1527(c)(1), (2), (5); 20 C.F.R. § 416.927(c)(1), (2), (5). He also considered the weight of the evidence supporting Dr. Trost's opinions and the opinions' consistency with the record. *See* R. 31; 20 C.F.R. §§ 404.1527(c)(3)–(4), 416.927(c)(3)–(4). As for Ms. Curtis and Ms. Kent, the ALJ considered

15

their professional qualifications, the length and nature of their relationship with White, the weight of the evidence supporting their opinions, and their opinions' consistency with other evidence in the record. *See* R. 26, 27, 30, 31; 20 C.F.R. §§ 404.1527(c)(1)–(5), 416.927(c)(1)–(5). Thus, the ALJ applied the correct legal standards in evaluating each provider's opinions. *See Burch*, 9 F. App'x at 259 (treating source); *Adkins*, 2014 WL 3734331, at *3 (non-acceptable medical source).

The ALJ explained that those opinions, including the GAF scores, were inconsistent with White's medical records, "generally routine and conservative treatment," mostly "unremarkable mental status exams," and recent community service work. R. 30, 31. These are "specific and legitimate reasons" to reject even a treating-source medical opinion if they are supported by substantial evidence in the record. *Bishop*, 583 F. App'x at 67; *accord Clemins v. Astrue*, No. 5:13cv47, 2014 WL 4093424, at *1–2 (W.D. Va. Aug. 18, 2014) (questioning GAF scores' probative value in social security disability cases). The record supports the ALJ's reasoning as to Ms. Kent's and Dr. Trost's opinions.

In February 2011, Ms. Kent filled out a check-box form indicating that White would be "unable to participate in employment and training activities in any capacity" for 60 days. R. 340. The ALJ correctly found that this is an opinion on an issue reserved to the Commissioner and that Ms. Kent did not provide any counseling notes that might support or explain her opinion. R. 31. Ms. Kent's failure to marshal any evidence supporting or otherwise explaining her opinion is a legitimate reason to reject it. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

Dr. Trost opined in April 2012 that White's "severe" depression and anxiety had "not responded to aggressive treatment" over the past year and that White had been hospitalized "for a suicidal gesture" during the same time. R. 579. White objects to the ALJ's finding that his

16

treatment was "routine and conservative" when Dr. Trost opined that White's treatment was "aggressive." *See* Pl. Br. 8 n.8. The ALJ correctly found that White was prescribed several psychiatric drugs, attended "bimonthly medication checks," and regularly participated in group therapy. R. 30, 31. This may well be "aggressive" treatment for a mental impairment like depression. *See Gill v. Astrue*, No. 3:11cv85-HEH, 2012 WL 3600308, at *6 (E.D. Va. Aug. 21, 2012) ("There [is] no bright-line rule [for] what constitutes 'conservative' versus 'radical' treatment."). Whether the ALJ properly characterized the nature of White's treatment does not matter in this case, however, because the record fully supports his other reasons for rejecting Dr. Trost's opinions.

For example, Dr. Trost opined that White could not work because he had "been hospitalized once in the past year for a suicidal gesture and is [an] increased risk of suicide given [his] ongoing suicidal ideation." R. 579. White's January 2012 hospital records, however, contain no indication that he had contemplated or attempted suicide. *See* R. 472–73, 475, 480, 481, 482, 488, 563–64, 566, 568. Rather, White "mistakenly" misused medications Dr. Trost had prescribed a few days earlier. R. 475, 562. White also expressly denied suicidal ideation when he checked into the crisis center on March 2, 2011. R. 325. The same day, White told Dr. Prasad that he sometimes thought about "jumping off the bridge in[to] the highway," but "because of his religion," he was not "going to do any such thing." R. 371, 372. Dr. Habib, Dr. Trost, and Nurse Jones all opined that White did not pose a danger to himself even when he admitted suicidal ideation. *See* R. 359, 446, 588, 590, 598, 599. These obvious, unexplained conflicts between Dr. Trost's opinion and White's medical records provided legitimate grounds for the ALJ to discount Dr. Trost's opinion. *See Cooke v. Colvin*, No. 4:13cv18, 2014 WL 4567473, at *3–4 (W.D. Va. Sept. 12, 2014) (Kiser, J.); 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).

17

White counters that Dr. Trost's clinic notes support his opinion because they document White's symptoms and self-reported reactions to different medications. The ALJ, however, correctly found that Dr. Trost's notes also document mostly normal mental status exams throughout the relevant period. *See, e.g.*, R. 359, 583, 587, 588, 595, 597, 598. It was up to the ALJ to weigh Dr. Trost's notes against his opinion to determine which was more persuasive. *Cooke*, 2014 WL 4567473, at *3–4. Unfortunately for White, "the ALJ sided—fairly and consistently with the law—against Dr. Trost." *Id.* at *4; *accord Craig*, 76 F.3d at 590 (substantial evidence supported ALJ's decision to reject treating physician's opinion that mirrored the claimant's complaints, but conflicted with the physician's own treatment notes).

The ALJ also questioned Dr. Trost's opinion that White's "symptoms would predictably worsen" if he tried to return to work, R. 579, because it conflicted with White's testimony that he spent six hours each week performing community service at Goodwill, R. 31. White objects that this is not a "good reason" to "demean [Dr. Trost's] credibility." Pl. Br. 9 n.10. I disagree. The regulations require that the ALJ provide "specific and legitimate reasons," *Bishop*, 583 F. App'x at 67, for the weight assigned to a treating-source medical opinion, *Morgan*, 142 F. App'x at 722. "The ALJ may properly discount the opinion of a treating physician when it is inconsistent with a claimant's daily activities." *Chestnut v. Colvin*, 4:13cv8, 2014 WL 2967914, at *4 (W.D. Va. June 30, 2014) (Kiser, J.). White's admitted ability to perform even some "work-like" community service is indeed inconsistent with Dr. Trost's opinion that White cannot work at all.

White does not point to any credible evidence that arguably entitles Dr. Trost's or Ms. Kent's opinions to greater weight. He simply disagrees with the ALJ's choice between conflicting evidence. *See generally* Pl. Br. 10–14. This Court cannot second-guess the ALJ when he gave specific and legitimate reasons, supported by substantial evidence in the record, for

18

discrediting a medical source's opinion. *Bishop*, 583 F. App'x at 67. Given the persuasive evidence discussed above, I find no error with the ALJ's decision to reject Dr. Trost's and Ms. Kent's opinions.

I cannot say the same for the ALJ's decision to reject Ms. Curtis's opinions of White's limited ability to maintain concentration, persistence, and pace. In July 2011, Ms. Curtis opined that White had "moderate" difficulty performing at a consistent pace and "marked" difficulty maintaining concentration or focus. R. 381. Those opinions are roughly consistent with Drs. Niemeier and Bruce's opinions that White had moderate difficulty maintaining concentration, persistence, or pace. R. 85, 107. The ALJ adopted Drs. Niemeier and Bruce's opinions at step three, R. 23, but rejected Ms. Curtis's opinions at step four, R. 31. This contradiction requires an adequate explanation.

The ALJ explained that he rejected Ms. Curtis's opinions because, "other than the [July 2011] DDS form," she did not provide any counseling notes or mental status exams. R. 31. He also reasoned that White would be in "ongoing treatment with a psychiatrist or psychologist, rather than just counseling," if he were as limited as Ms. Curtis suggested in July 2011. *Id.* The ALJ's rationale contradicts evidence that he discussed elsewhere in his decision. *See* R. 26–27. For example, White had been under Dr. Trost's psychiatric care, in addition to counseling, for several months by the summer of 2011. *See id.* In August 2011, Ms. Curtis completed a detailed Mental Status Evaluation Form documenting her impressions of White's memory, mood, thought content, judgment, and concentration while he was in counseling, as well as her reasons for imposing at least "moderate" limitations on White's concentration, persistence, and pace. *See* R. 410–13. The ALJ summarized that report when discussing White's treatment history, R. 27, but he did not mention it when rejecting Ms. Curtis's recommended mental restrictions in part for

19

lack of supporting treatment notes, R. 31. This flawed rationale undermines the ALJ's evaluation of Ms. Curtis's opinion.

Furthermore, the ALJ provided an inadequate explanation for his determination of White's RFC, in particular his reliance on Drs. Niemeier and Bruce's opinions. An ALJ may rely on a non-examining source's medical opinion when it is consistent with the record. *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984); *see also Radford*, 734 F.3d at 295 (citing *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995) (holding that a non-examining physician's opinion cannot by itself constitute substantial evidence)). The ALJ found that Drs. Niemeier and Bruce's functional "assessments [were] consistent with the other credible evidence of record," R. 32, but he did not identify that evidence or explain how it was consistent with the state-agency psychologists' opinions. *See Mascio v. Colvin*, --- F.3d ---, 2015 WL 1219530, at *2 (4th Cir. Mar. 18, 2015) (noting that the ALJ's RFC determination "must include a narrative discussion describing how the evidence supports each conclusion," including cites to specific medical and nonmedical facts) (citing SSR 96-8p, at *1, *7).

The ALJ "generally adopted" portions of Dr. Niemeier's opinion that White could perform "simple routine work activity" involving "simple, repetitive tasks" and "may experience some social interaction problems." *See* R. 24, 31–32, 88–89. At step three, the ALJ agreed with Drs. Niemeier and Bruce's opinions that White had "moderate" limitations maintaining concentration, persistence, and pace, R. 23, but, at step four, he never mentioned their function-by-function assessments of how those limitations affected White's ability to perform specific work-related activities on a sustained basis, *compare* R. 31–32, *with* R. 86–87, 108–09.

Those assessments were particularly important in this case because they limit White's ability to perform even simple tasks under normal working conditions. *See Mascio*, 2015 WL

20

1219530, at *3. For example, both state-agency psychologists opined that White would have "moderate limitations" maintaining attention and concentration for extended periods, performing activities within a schedule and at a consistent pace without unreasonable breaks, and sustaining an ordinary routine without special supervision. R. 87, 109. If the ALJ rejected those opinions, then "he needed to both say so and to explain why." *Smith v. Heckler*, 782 F.2d 1176, 1181 (4th Cir. 1986); *accord Mascio*, 2015 WL 1219530, at *3; *Warren v. Astrue*, No. 2:08cv3, 2008 WL 3285756, at *11 (W.D. Va. Aug. 8, 2008) ("The ALJ's decision cannot be supported by substantial evidence when he fails to explain his rationale for rejecting the opinions of those whom he otherwise gave great weight to in arriving at his decision."). The lack of explanation is especially glaring considering the ALJ's inconsistent findings at steps three and four.

Finally, the ALJ did not explain how "simple, routine, repetitive work" accommodates White's "moderate difficult[y]" maintaining concentration, persistence, and pace. *See Mascio*, 2015 WL 1219530, at *5–6. The Fourth Circuit recently held "that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting [him] to simple, routine tasks or unskilled work.'" *Id.* at *5 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). Unskilled work "is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher*, 181 F. App'x at 364 n.3 (quoting 20 C.F.R. § 404.1568(a)). The term itself tells us little, if anything, about the person's mental condition, let alone his ability to concentrate on or persist in a task or maintain the pace required to complete even simple tasks in a competitive work environment. *See Mascio*, 2015 WL 1219530, at *5. Perhaps the ALJ can explain why White's moderate limitations maintaining concentration, persistence, and pace do not require corresponding restrictions in his RFC, or why Drs. Niemeier and Bruce's functional

assessments overcompensate for White's credible limitations. *See id.* His failure to do so in this case, however, is reversible error and requires remand. *See id.*

### V. Conclusion

The ALJ must "deliver a clear and unambiguous decision that sufficiently explains the grounds for his determination, 'building an accurate and logical bridge between the evidence and his conclusions.'" *Young v. Astrue*, 771 F. Supp. 2d 610, 619 (S.D. W. Va. 2011) (quoting *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)). On this record, there are too many missing links in the ALJ's bridge for the Court to uphold the Commissioner's final decision that White is not disabled. Accordingly, I recommend that the Court **GRANT** White's motion for summary judgment, ECF No. 15, **DENY** the Commissioner's motion for summary judgment, ECF No. 20, **REVERSE** the Commissioner's final decision, and **REMAND** this case for further proceedings under the fourth sentence of 42 U.S.C. § 405(g).

### <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: April 8, 2015

*Joel C. Hoppe*

Joel C. Hoppe
United States Magistrate Judge